IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 26, 2025 Session

**SUSAN ANDERSON, BY HER CONSERVATORS,
REBECCA WOODS AND SOUTHEASTERN TRUST COMPANY
v. ASCENSION HEALTH-IS, INC., ET AL.**

**Appeal from the Circuit Court for Hamilton County**
**No. 18-C-1100          Kyle E. Hedrick, Judge**

_____

**No. E2024-01231-COA-R3-CV**

_____

In this action, the plaintiff, through her conservators, asserted health care liability and breach of contract claims against the senior living facility where she resides and its parent corporation. Following some amount of discovery, the parties filed competing motions for partial summary judgment concerning the breach of contract and financial claims. The trial court conducted a hearing regarding the motions and granted partial summary judgment in favor of the senior living facility based on the terms of the contract signed by the plaintiff. The trial court further certified the judgment as final. The plaintiff has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

W. Neil Thomas, III, and Michael M. Thomas, Chattanooga, Tennessee, for the appellant, Susan Anderson, by her conservators, Rebecca Woods and Southeastern Trust Company.

Daniel M. Stefaniuk, Brie Allaman Stewart, and Sharel V. Hooper, Chattanooga, Tennessee, for the appellee, Ascension Health-IS, Inc., and Alexian Village of Tennessee.

**OPINION**

**I. Factual and Procedural History**

On October 2, 2018, the plaintiff, Susan Anderson, by and through her conservators, Rebecca Woods and Southeastern Trust Company[1] ("Conservators"), filed a complaint in the Hamilton County Circuit Court ("trial court") against Ascension Health-IS, Inc. ("Ascension"); Alexian Village of Tennessee ("Alexian"); Gayle Trupiano; Terri Thompkins; Kathleen Puri; Douglas Malin; and Gregory J. Nieckula, M.D. Ms. Anderson stated in the complaint that she was a resident of Alexian, a senior living community owned by Ascension. The individual defendants were either employees or board members of Ascension or Alexian. Ms. Anderson averred that she had filed suit to assert claims of "breach of contract, financial exploitation of the elderly, negligence and negligent hiring in connection with the provision of inadequate and irresponsible patient care[,] and improper charges collected from [Ms. Anderson] by Alexian for which Ascension is responsible."

In her complaint, Ms. Anderson stated that on August 11, 2011, she and her husband, Ralph Anderson, had entered into a contract ("2011 Contract") with Alexian to reside in Alexian Village. She averred that Alexian Village consisted of different facilities: independent living apartments, assisted living centers, and a nursing/rehabilitation center known as the "Health and Rehabilitation Center" ("Health Center"). The Andersons paid a "Life-Time Use Fee" of $237,200.00, which Ms. Anderson explained would provide the Andersons with a "guaranteed . . . level of care and residential benefits for life without the worry of the cost of that care increasing as their needs might increase" and would allow the Andersons to receive care at any level of the Alexian facilities. Ms. Anderson alleged that the Andersons also paid monthly service fees for such services as meals, laundry, housekeeping, and maintenance. Ms. Anderson articulated that the 2011 Contract further provided for a refund of the Life-Time Use Fee upon termination of the agreement.

Mr. Anderson passed away on February 3, 2013. Ms. Anderson claimed that pursuant to the terms of the 2011 Contract, Alexian owed a refund of a percentage of the Life-Time Use Fee because Mr. Anderson died a mere eighteen months after the 2011 Contract was executed. Ms. Anderson also asserted that Alexian did not refund her any monies and instead increased her monthly service fee without notice or explanation.

Ms. Anderson averred that following Mr. Anderson's death, her health began to rapidly deteriorate such that she needed to be moved to Alexian's Health Center. However, Alexian purportedly did not have room for Ms. Anderson in that facility, so she remained

---

[1] The Hamilton County Chancery Court appointed Ms. Woods as conservator respecting the person of Ms. Anderson due to Ms. Anderson's disability status. The chancery court appointed Southeastern Trust Company as limited conservator over Ms. Anderson's estate.

- 2 -

in the apartments. According to Ms. Anderson, Alexian had charged her for private duty nurses and for nurses "employed by Alexian and for a care-giver, Care Connections." Ms. Anderson asserted that these charges amounted to more than $137,000.00. She further claimed that Alexian had failed to provide many of the services that were required under the 2011 Contract and thus should refund her for a portion of her monthly service fees. Ms. Anderson therefore alleged that Alexian had breached the 2011 Contract and owed her damages. Ms. Anderson further instituted a claim of "financial exploitation" of an elderly person. In addition, Ms. Anderson asserted health care liability claims against Alexian.

Concerning Ascension, Ms. Anderson claimed that Ascension had sufficiently dominated the acts and transactions of Alexian so as to warrant disregard of Alexian's corporate existence and to impose Alexian's liabilities on Ascension. Ms. Anderson also alleged that Ascension had caused Alexian to transfer millions of dollars to Ascension over the course of the preceding few years, allowing Alexian to fail to show an operating profit. Ms. Anderson averred that Ascension should be held liable for Alexian's acts and negligence.

Ms. Anderson attached a copy of the 2011 Contract to her complaint. The 2011 Contract provides that Alexian owns and operates a retirement community consisting of independent living apartments, assisted living centers, and a nursing home (the Health Center) that provides intermediate and skilled nursing care. The 2011 Contract also details that it contains a "Lifecare Plan," which "remains in effect unless otherwise terminated." According to the 2011 Contract, the Lifecare Plan

> provides a Health Care Benefit, at a reduced cost, which guarantees Resident lifetime access to [Alexian's] Health and Rehabilitation Center and/or Assisted Living Centers, or if temporarily unavailable, in another licensed nursing facility, community-based residential facility or registered/certified residential care apartment complex until a bed becomes available at [Alexian], as specified herein. For purposes of this Agreement, "nursing care" and "personal care" include services that facilities may provide under applicable State of Tennessee Code.

The 2011 Contract also contains provisions regarding its termination, which may be accomplished by a resident upon "sixty (60) days written notice of the intention to terminate" or by Alexian "for cause," which includes non-payment, lack of cooperation by the resident, misconduct by the resident, etc. Additionally, the 2011 Contract provides a refund schedule for the "Life Use Fee" in the event of termination.

On October 30, 2018, Ms. Anderson filed a notice voluntarily dismissing the individual defendants named in her complaint, and the trial court entered an agreed order of voluntary dismissal shortly thereafter. Alexian filed an answer on December 14, 2018,

denying the material allegations of the complaint and asserting various affirmative defenses. Ascension filed a similar answer.

On May 6, 2020, Ms. Anderson filed a motion for partial summary judgment, asserting that she should be granted summary judgment concerning the issue of her entitlement to a refund pursuant to the 2011 Contract. Ms. Anderson also asserted that she should be granted summary judgment on the issue of whether a subsequent contract, signed by her when she began residing at the Health Center in October 2014 ("2014 Contract"), was void because it was not signed by her conservator. Ms. Anderson attached to her statement of material facts copies of the 2014 Contract, the September 2014 order appointing a conservator over her estate, and the April 2014 order appointing a conservator respecting her person.

On July 27, 2023, Ms. Anderson filed a second motion for partial summary judgment, urging that summary judgment should be granted in her favor concerning the two issues raised in her first motion as well as regarding the issue of her entitlement to a partial refund of the charges made under the 2014 contract "after allowance for charges based on quantum meruit." Ms. Anderson argued that inasmuch as the 2014 contract was void, she could only be charged for services rendered on a quantum meruit basis such that she was due a refund for any overpayment.

On January 9, 2024, Ascension and Alexian (collectively, "Defendants") filed a joint motion for partial summary judgment concerning Ms. Anderson's claims of breach of contract and financial exploitation. In support, Defendants filed a brief asserting that (1) Ms. Anderson was not entitled to a refund of the Life Use Fee pursuant to the 2011 Contract, (2) Ms. Anderson could not show that she had been overcharged respecting the monthly service fees, and (3) Ms. Anderson could not recover damages for nursing fees relative to Defendants' alleged failure to transfer her to the Health Center because there was no breach of the 2011 Contract. Defendants also filed a statement of material facts and attached deposition excerpts, an affidavit, and billing records to substantiate their position. Both sides submitted briefs and multiple additional documents in support of or in opposition to the competing summary judgment motions.

On April 2, 2024, the trial court conducted a hearing regarding the countervailing summary judgment motions. On April 18, 2024, Ms. Anderson filed a motion seeking to re-open discovery, on a limited basis, concerning the issues of rebate and reimbursement rates. Defendants opposed the motion, and the trial court subsequently entered an order denying the motion.

On July 18, 2024, the trial court entered an order regarding the competing motions for partial summary judgment. In its order, the court clarified that Ms. Anderson's health care liability claims were not at issue in the partial summary judgment motions. Accordingly, the only claims adjudicated through summary judgment were the claims of

- 4 -

breach of contract, relative to both the 2011 Contract and the 2014 Contract, and the claim of "financial exploitation." The court further explained:

> Plaintiffs sought summary judgment on three (3) issues: (1) Plaintiffs' claim for a refund of part of the Life Use Fee paid by Ralph and Susan Anderson upon their admission to Defendants' independent living facility in August of 2011; (2) Plaintiffs' claim for breach of contract due [to] Defendants' alleged Monthly Service Fee charges at a Double Occupancy Rate between the date of Ralph Anderson's death in February 2013 and Susan Anderson's admission to Defendants' nursing home facility in October 2014; and (3) Plaintiffs' claim for private duty nursing fees due to an alleged delay in Susan Anderson's transfer from Defendants' independent living facility to Defendants' nursing home facility.

> Defendants sought summary judgment on the same three (3) issues as those addressed in Plaintiffs' Motion for Partial Summary Judgment, and also sought summary judgment on two (2) additional issues: (1) Plaintiffs' claim for "failure of consideration" set forth in Paragraphs 23-24 of Plaintiffs' Complaint; and (2) a claim for "financial exploitation" due to the alleged failure to provide a refund of the Life Use Fee, which was based on the same allegations as Plaintiffs' claim for a refund of the Life Use Fee.

> Based on the Court's review of the 2011 Contract, the 2014 Contract, and all of the submissions by the parties in support of their respective Motions for Partial Summary Judgment, and in response to the opposing parties' Motions for Partial Summary Judgment, the argument of counsel and admissions on the record at the hearing which took place on April 2, 2024, this Court adopts the findings of fact and conclusions of law set forth in its oral ruling on both Motions for Partial Summary Judgment, and further incorporates by reference Plaintiffs' counsel's admission on the record that summary judgment on (1) Plaintiffs' claims for alleged breach of contract due to Defendants' alleged Monthly Service Fee charges at a Double Occupancy Rate; and (2) Plaintiffs' claims for "failure of consideration" is appropriate and not contested by Plaintiffs. A copy of the ruling of the Court from the Transcript of Proceedings for the April 2, 2024 hearing is attached hereto as **Exhibit A**, and is incorporated herein by reference.

> Accordingly, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiffs' Motion for Partial Summary Judgment is **DENIED** in all respects. Defendants' Motion for Partial Summary Judgment is **GRANTED** in all respects. There being no just reason for delay, [this is a] final judgment on the claims addressed in Defendants' Motion for Partial

Summary Judgment pursuant to Rule 54.04 of the <u>Tennessee Rules of Civil Procedure</u>.

The transcript incorporated into the trial court's order demonstrates that during the summary judgment hearing, Ms. Anderson's attorney conceded that Alexian had provided documentation establishing that Ms. Anderson had been charged only the single occupancy rate following her husband's death. Ms. Anderson's counsel also conceded that summary judgment should be granted in favor of Defendants regarding Ms. Anderson's claim of failure of consideration.

The trial court found that the "Life Use Fee" paid by the Andersons under the 2011 Contract was for "the use of that facility for the monthly fee for the rest of your life," which the court noted to be a "huge benefit." The court determined that the Life Use Fee paid by the Andersons granted them an apartment or whatever type of living accommodation they needed in any Alexian facility for the remainder of each of their lives with payment of the applicable monthly fee. The court further found that the monthly fee charged to Ms. Anderson was reduced to a single-occupancy rate following Mr. Anderson's death although the fee had also increased over time. Accordingly, the court determined that the Life Use Fee was not solely applicable to the original apartment that the Andersons occupied; rather, it was applicable to "every portion of that facility." Although Ms. Anderson's counsel argued that the Life Use Fee refund schedule, found in Appendix C to the 2011 Contract, should have been applied when Mr. Anderson died and no longer occupied the apartment, the court discerned that Appendix C only applied upon termination of the 2011 Contract by both Mr. Anderson and Ms. Anderson, which had not occurred. Moreover, the court noted that this interpretation inured to Ms. Anderson's benefit because it would allow her to continue to receive the benefits of the life care plan.

With reference to the "extra" nursing charges Ms. Anderson had paid while she was still residing in the apartment (before being moved to the Health Center), the trial court found that the evidence supported Alexian's assertion that a bed had been available in the skilled care facility and that this had been timely communicated to Ms. Anderson's conservator. The court also found that the decision not to relocate Ms. Anderson at that time had been made by the conservator. The trial court accordingly granted Alexian's motion for partial summary judgment and denied Ms. Anderson's opposing motion. The court further certified its judgment as final pursuant to Tennessee Rule of Civil Procedure 54.04. Ms. Anderson timely appealed.

II. Issues Presented

Ms. Anderson presents the following issues for our review, which we have restated slightly:

1.	Whether the trial court erred by granting summary judgment in favor of Alexian regarding Ms. Anderson's breach of contract claim when:

a.	the trial court failed to interpret the actual language relied upon by Ms. Anderson in support of her position;

b.	the contract contemplated that termination would occur and a refund would be due "where both parties left the apartment";

c.	Appendix C provided that when a resident moved to the Health Center after leaving the apartment, the charges for the Center would be offset against any refund due; and

d.	the trial court failed to make findings with respect to the offset of Health Center charges against any refund due.

2.	Whether the trial court erred by denying Ms. Anderson's request for discovery concerning Alexian's treatment of similarly situated residents relative to claims for refund.

3.	Whether the trial court erred by granting summary judgment in favor of Alexian regarding Ms. Anderson's claim that, pursuant to the 2011 Contract, she should have been (a) transferred to a facility that could provide the care she needed until that care was available at Alexian or (b) reimbursed for her nursing expenses until such a transfer could be made.

III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law, which we review *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment*

- 7 -

*stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* [*v. Zenith Radio Corp.*], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'"

*TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).

To the extent that we are required to review the trial court's interpretation of a contract, our Supreme Court has further stated that the "cardinal rule [in interpreting contracts] . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 86 (Tenn. 1999) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "A determination of the intention of the parties 'is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide.'" *Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005 (quoting *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). Issues of contract interpretation are therefore reviewed *de novo*. *See Dick Broad. Co.*, 395 S.W.3d at 659.

## IV. Breach of Contract Claim

Ms. Anderson argues that the trial court erred by granting summary judgment in favor of Alexian respecting her breach of contract claim because (1) the trial court allegedly failed to interpret the actual language relied upon by Ms. Anderson in support of her position; (2) the 2011 Contract purportedly provided that termination occurred and a refund was due "where both parties left the apartment"; (3) Appendix C to the 2011 Contract provided that when a resident moved to the Health Center after leaving the apartment, the charges for the Center would be offset against any refund due; and (4) the trial court failed to make findings with respect to the offset of Health Center charges against any refund due. Defendants contend that the trial court properly granted partial summary judgment in their favor because the 2011 Contract unambiguously states that no refund of the Life Use Fee would be due unless both Mr. Anderson and Ms. Anderson terminated the agreement.[2]

The trial court found that the "Life Use Fee" paid by the Andersons under the 2011 Contract was for "the use of that facility for the monthly fee for the rest of your life," which the court concluded was a "huge benefit." The court also determined that the Life Use Fee was not restricted to the original apartment that the Andersons had occupied but instead was applicable to "every portion of [the Alexian] facility." Despite Ms. Anderson's argument to the contrary, the court determined that Appendix C only applied upon termination of the 2011 Contract by both Mr. Anderson and Ms. Anderson, which had not

---

[2] Neither party relies on the 2014 Contract on appeal. In fact, Ms. Anderson asserted in her reply brief that the 2014 Contract was void because Ms. Anderson was already subject to a conservatorship at the time she signed it. The 2014 Contract was signed by Ms. Anderson in October 2014, when she entered the Health Center, and it was not signed by her conservator. Accordingly, the parties appear to agree that the 2011 Contract is the controlling document, and neither party has raised any issue regarding the 2014 Contract.

occurred. The court noted that this interpretation benefitted Ms. Anderson because it would allow her to continue to receive the benefits of the life care plan.

In interpreting a contract, our "initial task is to determine whether the language in the contract is ambiguous." *Ray Bell Constr. Co., Inc. v. State, Dept. of Transp.*, 356 S.W.3d 384, 386-87 (Tenn. 2011). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Id.* at 387. This Court has explained the principles that should be applied to determine whether contract language is clear or ambiguous as follows:

> The language in dispute must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.*

*Vanbebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007). It is well-settled that "ambiguities in a contract are to be construed against the party drafting it." *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995). However, "[t]he parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) (quoting *GRW Enters. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)).

Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms." *Frizell Constr. Co.*, 9 S.W.3d at 86 (quoting *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990)). No single clause in a contract is to be viewed in isolation; rather, the contract is to be "viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another." *Frizell Constr. Co.*, 9 S.W.3d at 86 (quoting *Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)).

Article I of the 2011 Contract states that Ms. Anderson and her now-deceased husband, Ralph Anderson, had entered into an agreement for a "Lifecare Plan," which "indicates that this Agreement remains in effect unless otherwise terminated" and

provides a Health Care Benefit, <u>at a reduced cost, which guarantees Resident</u>

lifetime access to [Alexian's] Health and Rehabilitation Center and/or Assisted Living Centers, or if temporarily unavailable, in another licensed nursing facility, community-based residential facility or registered/certified residential care apartment complex until a bed becomes available at [Alexian], as specified herein. For purposes of this Agreement, "nursing care" and "personal care" include services that facilities may provide under applicable State of Tennessee Code.

(Emphasis added.) Article II of the 2011 Contract states that Mr. and Ms. Anderson would be occupying an apartment in Alexian Village and that Alexian would provide certain "resident" services, such as meals, housekeeping, and the like, to the Andersons for a monthly service fee. In addition, Article IV of the 2011 Contract states that Alexian would provide certain health care benefits to the Andersons upon their payment of a per diem co-pay. Article VII of the 2011 Contract provides that the one-time "Life Use Fee" paid by the Andersons totaled $237,200.00, with $216,300.00 allotted to one resident and $20,900.00 added for a second resident.

Article XII of the 2011 Contract is entitled, "Termination," and contains two subsections: "Termination by Resident" and "Termination by AVT [Alexian]." Regarding termination of the agreement by a resident, the 2011 Contract states:

Resident may terminate this Agreement by giving sixty (60) days written notice of the intention to terminate to the Chief Executive Officer either in person or by certified mail. Termination shall be effective sixty (60) days from the date of the notice or on the date specified in the notice, whichever is later. Resident must vacate the Unit before the termination date.

With reference to termination by Alexian, the 2011 Contract provides that it could be terminated "for cause upon thirty (30) days' notice of termination to Resident," and includes such examples of cause as nonpayment of monthly fees, destructive behavior, and misconduct by the resident.

Article XIII is entitled, "Refund Schedule," and provides that "[i]n the event of termination, refund of the Life Use Fee, as applicable, will be as outlined in the Refund Schedule attached as Appendix C." However, Article XIII also expressly states that "[n]o refund is due unless this Agreement is terminated with respect to every Resident who occupied the Apartment during the term of this Agreement." Appendix C, which presents the crux of Ms. Anderson's claim that a refund is owed to her, outlines the refund schedule of the Life Use Fee based on when the termination occurs, as follows:

1.      Prior to and during the first three (3) months of occupancy, if the Agreement is terminated for any reason, a full refund of the Life Use Fee (LUF) will be provided.

- 11 -

2.      After three (3) months of occupancy, the LUF will be refunded.at Ninety Percent (90%) [].

3.      Upon one (1) year of occupancy, the LUF will be refunded at Eighty Percent (80%).

4.      Thereafter, the remaining refund balance shall be reduced by the rate of 1/48th per month over [the] next four years.

5.      For Residents who occupy the Health Center/Assisted Living Center ("HC/ALC") before complete amortization of the Refund Balance:

     (a)     The difference between the actual charges incurred per day for care in the HC/ALC, and the Continuum of Care Days shall be charged against the remaining Refund Balance.

     (b)     If there are two occupants in the apartment unit and one occupant receives care in the HC/ALC, the difference between the Continuum of Care Days will be charged against the remaining Refund Balance.

6.      After five (5) years, no refund is provided.

Ms. Anderson contends that the trial court allegedly failed to interpret the actual language relied upon by Ms. Anderson in support of her position, which Ms. Anderson appears to characterize as Article XIII's language stating that the 2011 Contract can be terminated if every resident "leaves the Apartment." However, Article XIII's actual language provides that "[n]o refund is due unless this Agreement is terminated with respect to every Resident who occupied the Apartment during the term of this Agreement" (emphasis added).

Upon consideration of this contractual provision, we find it to be clear and unambiguous because the language utilized does not result in an uncertain meaning and cannot be fairly construed in more than one way. *See Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). According to the plain language of the 2011 Contract, before a refund of the Life Use Fee would be due, every resident who occupied the apartment at issue would have had to terminate the contract. This means that both Mr. Anderson and Ms. Anderson would have had to terminate the 2011 Contract to receive a refund of the fee.[3]

---

[3] Neither party argues that Alexian ever terminated the 2011 Contract. In fact, Alexian acknowledges that Ms. Anderson has continued to receive the benefits of that agreement to the present time.

The record is devoid of any proof that either Mr. Anderson or Ms. Anderson ever gave written notice of an intent to terminate the 2011 Contract in accordance with the termination provision in Article XII. Even if we assumed, *arguendo*, that the 2011 Contract terminated as to Mr. Anderson when he died,[4] there was no termination by Ms. Anderson that would satisfy the requirement in Article XIII that every resident terminate the agreement for a refund to be due.

Ms. Anderson advances the position that the above-quoted provision from Article XIII is ambiguous or should be read as stating that the 2011 Contract "is terminated if every resident 'leaves the Apartment.'" However, we find no provision in the 2011 Contract that can be construed to suggest that a termination occurs when both residents leave the apartment. As previously reviewed, "[a] strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank*, 519 S.W.2d at 805. In fact, such a construction would render the benefit of the Life Use Fee meaningless because the residents would not be able to enjoy the option of ongoing care for their lifetimes at the various levels offered by Alexian. In other words, if moving from the apartment to the Health Center terminated the agreement, the life care plan would offer no benefit whatsoever. "A court must construe the contract as a whole, 'giving effect to all of its provisions and avoiding a construction which would render any of those provisions illusory or meaningless.'" *Brim Holding Co. v. Province Healthcare Co.*, No. M2007-01344-COA-R3-CV, 2008 WL 2220683, at *5 (Tenn. Ct. App. May 28, 2008) (quoting *Seabreak Homeowners Ass'n Inc. v. Gresser*, 517 A .2d 263, 269 (Del. Ch. 1986)).

Ms. Anderson similarly posits that Appendix C must be interpreted as mandating a refund of the Life Use Fee when a resident moves from the apartments to the Health Center. In support, Ms. Anderson relies on the language found in subsection 5, which she characterizes as stating that when a resident is moved to the Health Center "after leaving the apartment," the charges for the Health Center should be offset against any "remaining Refund Balance," thereby implying that a refund is due when both residents leave the apartment. Subsection 5 actually states, however, that "[f]or Residents who occupy the Health Center/Assisted Living Center ('HC/ALC') before complete amortization of the Refund Balance," the "difference between the actual charges incurred per day for care in the HC/ALC, and the Continuum of Care Days shall be charged against the remaining Refund Balance." The apparent fallacy in Ms. Anderson's characterization of this provision is that the situation contemplated by subsection 5 could involve a resident who moves from the apartment to the Health Center and then decides to terminate before the five-year amortization period has ended. Although Ms. Anderson argues that this is what

---

[4] We note that this result is not always the case. *See Williamson Cnty. Broad. Co., Inc. v. Intermedia Partners*, 987 S.W.2d 550, 553 (Tenn. Ct. App. 1998) ("Contract rights ordinarily survive the death of one of the parties unless the contract is one of a personal nature.").

- 13 -

happened for Mr. Anderson, that does not alter the fact that Ms. Anderson did not terminate the 2011 Contract in accordance with the provisions found in Articles XII and XIII and is still receiving the benefit of the life care plan. Accordingly, no refund of the Life Use Fee is due to her, and the refund schedule and other language delineated in Appendix C is irrelevant.

Simply stated, because Ms. Anderson never terminated the 2011 Contract, no refund was due to her. Accordingly, there was no reason for the trial court to analyze the language found in Appendix C. We therefore affirm the trial court's grant of partial summary judgment in favor of Defendants on this issue. We further acknowledge and agree with the trial court's determination that this result benefits Ms. Anderson in that it permits her to continue to receive the benefits of the life care plan for the remainder of her lifetime.

As another issue, Ms. Anderson asserts that the trial court erred by denying Ms. Anderson's request for additional discovery concerning Alexian's treatment of similarly situated residents relative to claims for a refund. However, Ms. Anderson failed to further develop this assertion or provide any argument or authority concerning it in the body of her brief. We therefore determine that Ms. Anderson has waived this issue. *See Sneed v. Bd. of Prof'l Resp. of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Even had Ms. Anderson not waived this issue, further discovery would not have aided the trial court or this Court on appeal in the interpretation of unambiguous contract language. *See Staubach Retail Servs.-Se.*, 160 S.W.3d at 525.

## V. Nursing Expenses

Ms. Anderson also urges that the trial court erred by granting summary judgment in favor of Defendants regarding her claim that once her health declined and she could no longer safely occupy the apartment without additional care, the 2011 Contract mandated that she would be (a) transferred to a facility that could provide the care she needed until that care was available at Alexian or (b) reimbursed for her nursing expenses until such a transfer could be made. Ms. Anderson claims that when it became necessary for her to move to a higher level of care, a room was not available for her at the Health Center and she was thus forced to hire private nurses to provide the care she needed at her own expense. However, the trial court found that the evidence supported Defendants' assertion that a bed was available in the skilled care facility and that this was timely communicated to Ms. Anderson's conservator. The court also found that the conservator made the decision not to relocate Ms. Anderson at that time. Upon our thorough review, we agree.

Ms. Anderson asserts that a material issue of fact precluding summary judgment exists regarding the nursing charges she incurred from April to October 2014. Ms.

Anderson insists that Alexian did not have a bed available for her at the Health Center until October 2014 despite Defendants' assertion to the contrary. Ms. Anderson also argues that pursuant to Article 5, sections 5.2 and 5.5 of the 2011 Contract, Alexian "reserve[d] the exclusive right to transfer [Ms. Anderson] to a room in the Rehabilitation Center if the room is available" or, if a room is not available, "to move [Ms. Anderson] to another facility at its expense." Ms. Anderson propounds that based on these provisions, she would have been deemed to have consented to such transfer if Alexian decided the transfer was warranted. She further contends that Defendants cannot now argue that she has waived this provision.

The pertinent sections of the 2011 Contract state:

Section 5.1    *Assessment of Health Status*. Resident agrees that if he or she experiences a significant decline in health status, [Alexian] may require Resident to obtain a medical examination, at the Resident's costs, to determine if additional services or needs are required. In such cases, Resident agrees to provide [Alexian] with a copy of all treating physician's evaluations and recommendations.

Section 5.2    *Transfer of Resident; Resident's Rights*. The determination of whether Resident requires permanent or temporary care in the Alexian Inn, Valley Residence or in the Health and Rehabilitation Center will be made or confirmed by a committee consisting of the members of the Review Committee and the Resident's personal physician. If it is determined by the Committee and the Resident's personal physician that the Resident requires permanent or temporary transfer, **the Resident hereby consents to and [Alexian] may effectuate the transfer and the Resident hereby covenants not to sue or bring any cause of action against [Alexian] as a result of or in response to and shall hold [Alexian] harmless from such transfer.**

Section 5.3    *Transfer to Health and Rehabilitation Center or Assisted Living Centers*. Residents transferred to the Health and Rehabilitation Center or Assisted Living Centers shall be given priority admission in the following order: first, 90% Refundable Plan residents, second, Lifecare Plan residents and third, Rental Plus Plan residents and shall continue to pay the then current applicable Monthly Service Fee/Room & Board charge plus any applicable costs as described in **Appendix B**.

- 15 -

When Resident is admitted to the Health and Rehabilitation Center or Assisted Living Centers, state and federal regulations may require Resident to:

(a) Sign a separate Admission Agreement and consents for treatment and access to medical records;

(b) Obtain a health examination by a physician or other practitioner; and

(c) Comply with requirements to report income and obtain information or an assessment by state, local or family care agencies.

**Section 5.4** *Transfer to Alternate Facility*. Should a Resident require services not provided by [Alexian], or it is determined to be unsafe for the Resident to continue to reside at [Alexian], [Alexian] reserves the right to make transfer arrangements to an appropriate facility. Examples of conditions requiring additional care or supervision include dangerous or contagious diseases and/or behavioral problems that make Resident's presence detrimental to Resident's own well-being and/or the health or peace of other Residents. All fees and costs with respect to such transfer, including all services provided at the alternate facility, shall be the responsibility of the Resident. Until the time the Apartment is vacated and keys are turned in, the Resident shall be responsible to pay the then current applicable Monthly Service Fee.

**Section 5.5** *Accommodations*. [Alexian] reserves the right to place Resident in a semi-private room in the Health and Rehabilitation Center unless medical necessity dictates the need for a private room or Resident agrees to pay for private accommodations. In addition, [Alexian] also reserves the right to place Resident in a studio apartment at the Alexian Inn or private room at the Alexian Brothers Valley Residence. In the unlikely event that [Alexian] does not have an appropriate bed available at the Health and Rehabilitation Center or Assisted Living Centers, Resident may be temporarily admitted to another licensed nursing facility, home for the aged/assisted living facility, adult care home or a registered/certified residential care apartment complex. In such case, [Alexian] will be responsible for the difference in cost, if any, between

the daily rate at such other facility and what the Resident would have paid at [Alexian's] facility for each day of care until a bed becomes available at [Alexian].

A review of these contractual provisions reveals that Alexian did not maintain the "exclusive right" to transfer a resident to the Health Center, as Ms. Anderson suggests. Rather, the above-quoted sections provide that if a resident "experiences a significant decline in health status," Alexian <u>may</u> require the resident to undergo a medical examination to determine if a higher level of care is necessary. Moreover, these provisions state that the "determination of whether Resident requires permanent or temporary care" in a higher-care facility "will be <u>made or confirmed</u> by a committee consisting of the members of the Review Committee and the Resident's personal physician" (emphasis added). The contract further states that if such a determination is made or confirmed by the committee and physician, "Alexian <u>may</u> effectuate the transfer" (emphasis added). We find these provisions to be clear and unambiguous.

Nothing in the record demonstrates that the above-outlined steps were undertaken by Alexian to effectuate Ms. Anderson's transfer to a higher care facility. However, the permissive language of the contractual provisions belies Ms. Anderson's assertion that such a transfer by Alexian was mandatory and that Alexian had the "exclusive right" to make such a determination. *See Eberbach v. Eberbach*, 535 S.W.3d 467, 474 n.3 (Tenn. 2017) (recognizing that a contractual provision "contain[ing] only permissive language, such as 'may award,'" is discretionary in nature). In other words, although Alexian may have had the discretion to follow the above-described contractual process for moving Ms. Anderson to a higher-care facility, it would likewise have maintained the discretion to refrain from doing so.

The proof established that the Hamilton County Chancery Court appointed Linda Norwood as conservator "of the person" for Ms. Anderson on April 17, 2014. Ms. Norwood served in that capacity until November 2014; therefore, she was Ms. Anderson's conservator during the relevant time period when the nursing charges were incurred. The letter from the clerk and master appointing Ms. Norwood conservator stated:

**Ordered**, the following rights of THE WARD are removed: (a) the right to make contracts including marriage, (b) the right to make health care decisions, (c) the right to hold a driver's license, and (d) the right to vote. The following rights of THE WARD are transferred to the CONSERVATOR to exercise: to consent or not to any training, medical and mental examinations and treatment . . . to consent to admission to or discharge from hospitalization, transfer to or discharge from any residential setting, group home, or other housing placements[.]

- 17 -

Accordingly, based on the powers granted to her, Ms. Norwood possessed the ability to make health care decisions for Ms. Anderson and to determine whether to consent to her transfer to a different residential setting.

During her deposition, Ms. Norwood explained that at the time she was appointed conservator, Ms. Anderson had been suffering frequent falls in her apartment. Ms. Norwood thus believed that Ms. Anderson needed round-the-clock caregivers to ensure her safety. According to Ms. Norwood, Ms. Anderson did not wish to move to a higher-level facility at that time, so Ms. Norwood found caregivers and hired them to stay with Ms. Anderson. Ms. Norwood testified that when making this decision, she consulted with Al Secor, who represented Ms. Anderson's financial conservator at the time, as well as representatives of Alexian, to ascertain whether a better option was available. Ms. Norwood stated that Alexian's representatives would have allowed Ms. Anderson to move to a facility with a higher level of care if she had so desired. However, because Ms. Anderson did not want to move, they decided to "honor her wishes and help her transition mentally to this is where you need to be to be safe."

Ms. Norwood further testified that in June 2014, when she inquired, Alexian had a room available for Ms. Anderson at a higher-care facility, but the new Health Center was still being constructed at that time. Ms. Norwood related that Alexian did not refuse a request to move Ms. Anderson. Instead, Ms. Anderson had chosen not to move until the new facility was completed. Ms. Norwood stated that the same was true when she inquired in August 2014, and Ms. Norwood again made the decision to honor Ms. Anderson's request not to move until the new facility was completed despite the added expense of paying caregivers. Ms. Norwood reiterated that Alexian was willing to move Ms. Anderson to a higher-care facility at any time and did not refuse her request or "admit others ahead of" Ms. Anderson, as was suggested in the complaint.

Ms. Norwood identified a document prepared by Mr. Secor on June 5, 2014, which memorialized a conference held among Mr. Secor, Ms. Norwood, Ms. Anderson, Stuart Wood, and Beth Gonzenbach (from Alexian). This document reflects that a decision was made at that time to allow Ms. Anderson to stay in her apartment with round-the-clock caregivers, a decision which would exhaust Ms. Anderson's existing funds within approximately three years. The document further states:

> Since remaining in an independent living arrangement is not financially practical, [Ms. Anderson] agreed that she would move to a private room in the new Alexian Health and Rehabilitation Center [the Center] as soon as the new facility was ready to accept residents. The only additional cost of the room in the Center is a $30.00 per day charge for a private room.

[Ms. Anderson's] contract cost of being at Alexian once she moves to the Center will cover all her care costs except for the cost of a companion when she leaves the Center.

\* \* \*

Linda Norwood will contact Dr. Brandeis to get a current evaluation of [Ms. Anderson's] capabilities and what the future may hold for [Ms. Anderson].

Alexian also presented excerpts from the deposition of Mr. Secor, who characterized Ms. Anderson as "a difficult personality" and explained that she wanted to stay in her apartment as long as possible. Mr. Secor also testified regarding the June 2014 meeting and related that everyone agreed to keep Ms. Anderson in her apartment, per her wishes, and to pay caregivers until the new Health Center opened.

Based on the proof presented, we agree with the trial court's determination that a bed was available in the skilled care facility during the relevant time period and that this fact was timely communicated to Ms. Norwood. We further agree that the evidence demonstrated that Ms. Norwood made the decision not to relocate Ms. Anderson at that time. As Ms. Norwood testified, Alexian did not refuse a request to move Ms. Anderson to a higher-care facility. Instead, Ms. Anderson chose not to move until the new Health Center was completed, and Ms. Norwood, in conjunction with Mr. Secor, made the determination to honor Ms. Anderson's wishes and hire private caregivers at Ms. Anderson's expense. Although the newer Health Center was not available for Ms. Anderson until October 2014, the proof demonstrated that a room was available for her at the existing higher-care facility had she desired to move. Accordingly, we affirm the trial court's determination that Alexian did not breach its contract with Ms. Anderson.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's grant of partial summary judgment in favor of Defendants regarding Ms. Anderson's breach of contract and financial claims. We remand this matter to the trial court for further proceedings consistent with this Opinion. Costs on appeal are assessed to Susan Anderson, by her conservators, Rebecca Woods and Southeastern Trust Company.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE